**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TARIA GORDON,
*o/b/o SMCG, a minor,*

                  CASE NO. 2:18-cv-11432
      *Plaintiff,*       DISTRICT JUDGE DAVID M. LAWSON
                  MAGISTRATE JUDGE PATRICIA T. MORRIS
*v.*

COMMISSIONER OF SOCIAL
SECURITY,

      *Defendant.*
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (R. 11, 12)**

**I. RECOMMENDATION**

      In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff SMCG[1] is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 11), be **DENIED**, the Commissioner's Motion for Summary Judgment, (R. 12), be **GRANTED**, and this case be **AFFIRMED**.

---

[1] As SMCG is a minor, the suit is brought by her mother on her behalf. For ease of reference, however, I use "Plaintiff" to refer to SMCG.

## II. <u>REPORT</u>

### A. Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff's claim for Supplemental Security Income (SSI) under Title XVI, 42 U.S.C. §§ 1381-1383f. (R. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge. (R. 2.) Currently before the Court are Plaintiff's and Defendant's cross-motions for summary judgment (R. 11, 12.)

The application for SSI at issue in this case was filed on September 28, 2015, alleging onset of disability on February 26, 2015.[2] (R. 7, PageID.56, 220.) Plaintiff's claim was denied at the initial level on January 12, 2015. (R. 7, PageID.135). After an administrative hearing was held at Plaintiff's request, (R. 7, PageID.169), Administrative Law Judge (ALJ) Allison Dietz found that she had not been disabled from the date the application was filed through the date of the decision, June 12, 2017. (R. 7, PageID.56-68.) The Appeals Council denied Plaintiff's request for review. (R. 7, PageID.32-35.) This action followed. (R. 1).

---

[2] Plaintiff filed three earlier applications for benefits. (R. 7, PageID.134.) The first two applications were denied at the initial stage and no hearing occurred. (*Id.*) The most recent application, prior to the present one, was denied after a hearing (although the ALJ decision is not in the record) and it appears that Plaintiff never sought judicial review of that determination or the others. (*Id.*) The parties do not raise any issues regarding the prior applications.

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C.  Framework for Disability Determinations

Under the Social Security Act, Title XVI, SSI is available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1

(1984). The claimant must have a "disability," *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), which means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A); 20 C.F.R. § 416.905(a). A child will be considered disabled if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382a(3)(C)(I). To determine whether a child's impairment results in marked and severe limitations, SSA regulations prescribe a three-step sequential evaluation process:

1. If a child is doing substantial gainful activity, the child is not disabled and the claim will not be reviewed further.

2. If a child is not doing substantial gainful activity, the child's physical or mental impairments will be considered to see if an impairment or combination of impairments is severe. If the child's impairments are not severe, the child is not disabled and the claim will not be reviewed further.

3. If the child's impairments are severe, the child's impairments will be reviewed to determine if they meet, medically equal, or functionally equal a listing impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, the child will be found disabled.

20 C.F.R. § 416.924(a).

In the third step of this analysis, if the child's impairments do not meet or medically equal the listings, the Commissioner assesses whether the impairments functionally equal the listings. 20 C.F.R. § 416.926a(a). "'Functioning' refers to a child's activities; that is,

everything a child does throughout the day at home, at school, and in the community, such as getting dressed for school, cooperating with caregivers, playing with friends, and doing class assignments." SSR 09-1p, 2009 WL 396031, at *2 (Feb. 17, 2009). To determine functional equivalence, the regulations direct the Commissioner to evaluate how the child functions in six domains, which are "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). These domains are:

1.    Acquiring and using information;
2.    Attending and completing tasks;
3.    Interacting and relating with others;
4.    Moving about and manipulating objects;
5.    Caring for yourself; and
6.    Health and physical well-being.

*Id.* In each domain, the Commissioner considers the types of activities the child can and cannot perform, how those activities compare to other children without impairments, where the difficulties occur (*e.g.*, at home or school), whether the child can complete activities independently, and what help the child needs with activities. 20 C.F.R. § 416.926a(b)(2).

If the child's impairments result in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairment functionally equals the listing and the child will be found disabled. 20 C.F.R. § 416.926a(d). A marked limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). It "is 'more than moderate' but 'less than extreme.'" *Id.* An extreme limitation is one that "interferes *very* seriously with [a child's] ability to independently initiate, sustain or complete activities." 20 C.F.R. §

416.926a(e)(3)(i) (italics added). "It is "'more than marked,'" and represents "the rating [the Commissioner] give[s] to the worst limitations." *Id.*

### D. ALJ Findings

Following the three-step sequential analysis, the ALJ found Plaintiff was not disabled. (R. 7, PageID.68.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant time. (R. 7, PageID.59.) At step two, the ALJ determined that Plaintiff had the following severe impairments: hearing loss without cochlear implant, asthma, intellectual disability, and communication disorder." (*Id.*) At step three, the ALJ found that none of Plaintiff's impairments, alone or in combination, met or medically equaled a listed impairment. (R. 7, PageID.60.) Nor did Plaintiff's impairments functionally equal the listings: she had a marked limitation in the domain of acquiring and using information, but had less than marked limitations in the other five domains. (R. 7, PageID.60-68.)

### E. Administrative Record

#### 1. Individualized Education Plans and Grades

The earliest report is a multidisciplinary evaluation—dubbed an individualized education plan (IEP)—from October 2012, when Plaintiff was in sixth grade. (R. 7, PageID.296.) It documents Plaintiff's "[l]ong-standing stable mild sensorineural hearing loss" and "[b]orderline normal to mild sensorineural hearing loss, bilaterally." (*Id.*) The hearing loss posed a risk to her scholastic performance, so the evaluator recommended providing Plaintiff preferential seating in classrooms and possibly hearing aids. (R. 7,

PageID.297.) Since pre-school, her mother reported, Plaintiff had struggled with adapting and learning. (R. 7, PageID.301.) As a result, she had repeated the first grade. (*Id.*)

Testing results contained in the IEP showed that her cognitive functioning was "very low," making it difficult to place her in general education courses "without intensive supports." (R. 7, PageID.297.) Her verbal and thinking abilities were deficient, and her "[c]ognitive efficiency" was borderline. (R. 7, PageID.299.) In math and reading, she was "under" the 6th percentile. (R. 7, PageID.297.) Her cognitive functioning, adaptive behavior, and speech and language were rated "impaired." (R. 7, PageID.297.) Her cognitive "development" was at or below two standard deviations below the mean, which the report classified as a "mild" cognitive impairment. (R. 7, PageID.298.) One test of her adaptive behavior—which was taken by Plaintiff's teacher and mother—placed her below the 1st percentile, while another—again taken by the teacher and mother—showed her at the 2nd percentile. (R. 7, PageID.303.)

Overall, she met the standards for classification "as a student with a cognitive impairment." (R. 7, PageID.304.) Various accommodations were recommended, but it does not appear that Plaintiff was placed in special education classes. (R. 7, PageID.304-305.)

Another IEP was conducted three years later, in October 2015, finding that she remained eligible for special education programs and services due to her cognitive impairment. (R. 7, PageID.308, 320.) Since the last evaluation, she had made "some progress" in the general education curriculum. (R. 7, PageID.309, 388.) She was receiving "resource support services," which included "[a]ccommodations and preferential seating in front of the classroom facing the speaker at all times, extended time on tests, small group

7

setting, alternate test location, directions read to student, repeat/rephrase directions, visual prompts and use of a calculator." (*Id.*) These services were to be continued. (R. 7, PageID.390.) Her most recent grades at that time included F's in history, English, Spanish, and biology, and D's in math and music. (R. 7, PageID.309.) Test scores in math and reading were variously at the 2nd, 9th, and 12th percentiles, placing her anywhere from the 3.2 grade level to the 5.5 grade level. (R. 7, PageID.310) Elsewhere, the report stated that her Brigance test scores "showed reading and reading comprehension and math skills equivalence of 5th-6th grade levels." (R. 7, PageID.309.) The evaluation also noted that she struggled to retain information. (*Id.*)

Her hearing loss continued to cause "delays in her receptive and expressive language" skills, and she struggled to put together complex sentences. (R. 7, PageID.310.) She did not, however, wear hearing aids and the audiologist did not recommend an FM auditory unit. (*Id.*) The report suggested that Plaintiff needed continued preferential seating at the front of classrooms, that she be provided with a consultant once a month for 30 minutes, that she attend the "resource program" 5 hours per week, that she receive 30 minutes of unspecified "speech & language" programming 3 times each month, and that she consult with audiological services for 30 minutes each year. (R. 7, PageID.310, 312.) Attached to the evaluation was an audiology report that found minimal hearing loss in Plaintiff's right ear at a certain hertz level, and essentially normal hearing in her left ear. (R. 7, PageID.323.) Another report that appears to be related to the IEP stated that Plaintiff spoke in simple sentences, rather than compound or complex, and her vocal quality and oral motor functioning were normal. (R. 7, PageID.381.)

In October 2016, the school undertook another IEP assessment of Plaintiff's performance and functioning. (R. 7, PageID.397.) The report noted that Plaintiff worked well with others and could "be focused and driven at times." (*Id.*) According to her mother, however, her study habits were poor. (*Id.*) Recent testing of her reading abilities using the American Guidance Service Reading Level Indicator put her instructional reading at the 5.4 grade level and her independent reading at the 3.8 grade level. (*Id.*) Her Brigance mathematical computational score was 1.0. (*Id.*) She would remain in the general education curriculum, but with continued special accommodations, including the use of calculators and extended time for assignments. (R. 7, PageID.398-400, 407.) As for specialized services, she now would spend 10 hours a week in the resource program, but no other regular services were noted. (R. 7, PageID.405.)

Her grades in 2017 included F's in Algebra II and environmental science (with a note on her report card that she was "[a]chieving below apparent ability; [p]oor attendance is affecting work" in the science class), C's in French and history, and A's in English and Junior Reserve Officer Training Corps (JROTC). (R. 7, PageID.283.) This put her class rank, measured by overall weighted GPA, at 345 out of 402. (R. 7, PageID.286.) That rank is roughly equivalent to her placement in previous academic terms. (R. 7, PageID.287.)

### 2. Other Records

When Plaintiff was 13, in February 2013, she underwent a consultative examination. (R. 7, PageID.325.) According to Plaintiff's father, her hearing loss had begun at birth, and the cause was unknown. (*Id.*) At the time of the examination, when Plaintiff was in 7th grade, she was receiving B's and C's in school (in the 7th grade), and had been in special

education since the previous school year. (R. 7, PageID.326.) Though she maintained friendships with peers and neighbors, she did not act "right," according to her father, and her speech was difficult to understand. (*Id.*) On a typical day, she watched television and finished homework; her chores were washing dishes and making her bed; and her hobby was drawing. (*Id.*)

The evaluating psychologist, Dr. David Hayter, observed that Plaintiff's "[h]earing appears to be good for conservation in whispered tones," her speech was spontaneous with normal pitch and tone, and she "demonstrated fair expressive and receptive language skills." (*Id.*) During the intellectual functioning portion of the examination, Dr. Hayter noted that Plaintiff's inability to recall items "suggest[s] the patient has a limited capacity to encode and learn." (R. 7, PageID.327.) Her social judgment, however, "appears to be intact." (*Id.*) Other test results suggested to Dr. Hayter "deficits . . . in immediate, sustained attention and concentration abilities." (R. 7, PageID.328.) IQ tests produced a full-scale score of 70, in the borderline range. (*Id.*) Overall, Dr. Hayter concluded that Plaintiff could "acquire and use information." (R. 7, PageID.329.) She had demonstrated the ability during the testing to "attend to [a] task," "interact appropriately with the examination and examiner," "care for self, ask questions[,] and follow simple directions." (*Id.*)

Three years after this examination, Plaintiff was again evaluated in conjunction with her application for benefits. (R. 7, PageID.366.) Dr. Nick Boneff, a psychologist, noted that Plaintiff had never been hospitalized for mental issues and had not received therapy. (*Id.*) Plaintiff said that she passed her days "doing nothing, just sitting at home," sometimes watching television. (R. 7, PageID.367.) To get around, she walked. (*Id.*) Dr. Boneff

observed that Plaintiff answered questions logically and "appeared to be an accurate historian" with no tendency to distort her symptoms. (*Id.*) The IQ test returned a score of 56, putting her in the "mildly mentally retarded range," although the evaluator thought her intellectual function could be as high as borderline. (R. 7, PageID.368-369.) The overall picture of the testing showed "variability in cognitive functioning, with some strength in immediate and short-term memory and the ability to pay attention." (R. 7, PageID.369.) Consequently, Plaintiff "would appear capable of engaging in school and work type activities of a moderate degree of complexity and should be able to remember and execute a two or three step repetitive procedure with little to no independent judgment or decision making required." (*Id.*)

After the evaluation, the Commissioner wrote Dr. Boneff to ask why her IQ score was lower than it had been at the 2013 testing. (R. 7, PageID.372.) He responded that the more recent scores "are probably invalid due to lack of effort on the claimant's part in an attempt to score sufficiently lower to obtain Social Security benefits." (*Id.*) These suspicions of malingering were not mentioned in Dr. Boneff's original report, which stated that during the IQ testing Plaintiff "did appear to put forth adequate effort on the testing today, so today's results are tentatively felt to represent a valid and accurate measure of her current intellectual functioning"—as noted, however, Dr. Boneff originally posited that Plaintiff's intellectual functioning might exceed the level her test scores suggest. (R. 7, PageID.368-369.)

In March 2016, Plaintiff underwent a speech and language evaluation by a non-physician examiner, Sara Seligson. (R. 7, PageID.374.) The resulting report stated that

11

Plaintiff's speech and language problem became apparent in 1st grade and she began receiving services the following school year. (R. 7, PageID.374-375.) Plaintiff could speak in sentences and was understood by her family most of the time, but others only comprehended about half of her speech and she could make out roughly half of what she heard. (R. 7, PageID.375.) At the time of the evaluation, Plaintiff was enrolled in the general education program for 10th grade, although she received some special education services for speech and used a hearing device at school. (R. 7, PageID.375-376.)

During the testing with Ms. Seligson, Plaintiff "appeared to put forth her best effort," and the test results were deemed accurate. (R. 7, PageID.376.) The informal assessment of her hearing "revealed normal responses to speech in a quiet environment," normal voice quality, and normal fluency. (*Id.*) Her pragmatic language skills—such as greetings and staying on topic—were appropriate, her vocabulary and syntax were functional, she could retell a story, and she "presented functional conversation language skills." (R. 7, PageID.378.) She committed zero errors during formal articulation testing and her speech was spontaneous, yet her percentile rank was ">22," or greater than the 22nd percentile. (R. 7, PageID.376-377.) Single-word intelligibility was at 99 percent, as was conversation intelligibility. (R. 7, PageID.377.) The score for listening comprehension was "Deficient," registering at the level of a seven- to nine-year-old; the score for oral expression was "Below Average," at the 10-year-old level; and her oral language composite was "Deficient" with no accompanying age equivalent. (R. 7, PageID.377-378.) The upshot of the evaluation, according to Ms. Seligson, was a moderate impairment in receptive language ability and a mild to moderate impairment in expressive language

ability. (R. 7, PageID.378-379.) The impairments would interfere with academics but were "not expected to impact socialization with same age typically developing peers." (R. 7, PageID.379.)

In 2016, three consultants reviewed the medical record for the agency: Dr. Davis C. Hanson, a pediatrician; Dr. Zahra Khademian, a child psychiatrist; and Ms. Cheryl Lang, a speech pathologist. (R. 7, PageID.141-143.) Reviewing the evidence in the file, the consultants determined that Plaintiff had a marked—not an extreme—limitation in the domain of acquiring and using information. (R. 7, PageID.141.)

On March 21, 2017, Michael Brooks completed a teacher questionnaire provided by the Commissioner. (R. 7, PageID.412-420.) For about 7 months, Mr. Brooks had taught Plaintiff Algebra II and Social Studies, and also provided her with tutoring. (R. 7, PageID.412.) At the time, Plaintiff was in the 11th grade but her reading was at the 3.8 grade level and her math at the 1st grade level. (*Id.*) In the domain of acquiring and using information, Plaintiff had the following issues: a very serious problem comprehending and completing math problems; a serious problem reading and understanding writings; an obvious problem "understanding school and content vocabulary" and applying problem-solving skills; a slight problem comprehending oral instructions, organizing her oral explanations and providing adequate descriptions, expressing ideas in writing, learning new material, and recalling previous material; and no problem "[u]nderstanding and participating in class discussions." (R. 7, PageID.413.) Regarding her ability to attend and complete tasks, she had: an obvious problem paying attention to speakers (with the problem occurring weekly), focusing or refocusing long enough to finish tasks (a daily problem),

organizing her materials (daily), and working at a reasonable pace (daily); a serious problem completing work without careless mistakes (hourly); a slight problem sustaining attention during play (monthly), carrying out single or multi-step instructions (weekly), completing assignments (daily), and working without distracting or being distracted (daily); and no problem waiting to take turns or changing activities without being disruptive. (R. 7, PageID.414.) In her interactions and relations with others, she had fewer issues: a slight problem using language appropriate to the situation and interpreting facial expressions, body language, hints, and sarcasm; and an obvious problem introducing and maintaining relevant conversation topics and using adequate language to express herself in everyday conversation. (R. 7, PageID.415.)

In addition, Mr. Brooks stated he could understand almost all of her speech (the form questionnaire did not provide an option for any greater level of understanding). (R. 7, PageID.416.) In conclusion, Mr. Brooks noted that Plaintiff was polite, "work[ed] well in groups," and did well in most classes except Algebra II, in which she struggled with computations. (R. 7, PageID.420.)

### 3. Disability Application Reports

In October 2015 and May 2016, Plaintiff's mother completed form reports for the disability application. (R. 7, PageID.245-257.) When not in school, Plaintiff watched television, communicated with friends on social networks, and attended family functions. (R. 7, PageID.245.) She also liked to listen to music and to dance. (*Id.*) Around adults, she was respectful and shy; her "only problem" was failing to ask them for help when needed. (*Id.*) She was still in general education classes, with special accommodations of preferred

14

seating, a hearing device, and a special education teacher who assisted her in every class. (*Id.*) Plaintiff occasionally helped with some household chores, which she completed "very well with direction," and she could also prepare meals. (R. 7, PageID.246-247.) Personal care was not a problem for Plaintiff. (*Id.*) Both those who knew her and those who did not could understand her speech some of the time. (R. 7, PageID.246.) She could answer the phone and deliver messages, although at times she struggled to recall items, but that problem was "getting better." (*Id.*) She sometimes became distracted forgot that she was babysitting for others, for example. (R. 7, PageID.247.) She did not participate in clubs. (R. 7, PageID.248.) On a daily basis, she used public transportation, made change for a five-dollar bill, read for school, and shopped. (*Id.*) Her biggest hurdles were learning and communicating; while she could follow instructions, she did not retain information, think independently, or problem-solve without help. (R. 7, PageID.256.)

### 4. Administrative Hearing

Plaintiff's administrative hearing occurred on March 14, 2017. (R. 7, PageID.74.) She began by explaining her favorite class at school, JROTC, which required some "book work," testing, and practicing military-type drills. (R. 7, PageID.80.) She received an "A" in the class. (R. 7, PageID.82.)

She struggled in school because she could not hear the teachers, who usually did not repeat their statements, and sometimes she needed them to define words. (R. 7, PageID.82-83, 90, 95-96.) If she heard them, and knew the words they used, she could generally follow along. (R. 7, PageID.96.) Math, English, and environmental science were her most troublesome subjects. (R. 7, PageID.82-83, 90, 96.) In Algebra II, her current math level,

15

her teacher refused to enter grades for the work Plaintiff had submitted but the teacher had lost. (R. 7, PageID.96-97.) But in other classes, like history, she did not have difficulty with reading, (*id.*), and completing homework was not a problem. (R. 7, PageID.92.) Her "resource teacher" helped her in every class she needed, often by providing one-on-one assistance. (R. 7, PageID.91.) He was hard to track down, however, and Plaintiff did not spend much time with him. (*Id.*)

She understood her schoolwork if the teacher explained it one-on-one, but that only happened about twice a week. (R. 7, PageID.97-98.) Still, she would struggle to recall what she had learned "even after just a day." (R. 7, PageID.98.) Sometimes she would have to reread passages she had just read in order to remember them, but most of the time she did not have to. (R. 7, PageID.99.)

From 8th grade until the present school year, she had been given a hearing aid; but for unknown reasons "they" (presumably the school) had stopped providing it. (R. 7, PageID.83.) She got along with some teachers, but not others. (R. 7, PageID.89.) And she had no disciplinary record to speak of. (*Id.*) She had been forced to repeat an earlier grade, but there was no indication she would have to repeat again. (R. 7, PageID.99.) Her current GPA, a 2.00, was better than last year's. (R. 7, PageID.100.)

As for her social life, she had friends at school and a phone, and was active on social media. (R. 7, PageID.85.) She liked television, music, and video games, and she read books on her phone. (R. 7, PageID.86-87.) An entire day could be passed playing video games. (R. 7, PageID.88.) She had eight siblings she played with and they all got along "[v]ery well." (R. 7, PageID.88-89.) Because she lacked a driver's license, she got around by public

16

transportation, and she either asked for help when using it or looked up bus routes on her phone. (R. 7, PageID.86.) At stores, she could pay in cash and make sure she received the correct change. (R. 7, PageID.87.)

Her career goals were to become a cook or hairstylist. (R. 7, PageID.92.) She liked to prepare meals at home, following recipes (without trouble) from her phone or the box. (R. 7, PageID.92-93.) Currently, she worked as a seasonal employee at Honey Baked Ham preparing sandwiches and doing other customer-related work. (R. 7, PageID.94.) She had received help filling out the application for the job. (*Id.*)

Plaintiff's mother also testified. (R. 7, PageID.100.) Asked if Plaintiff could be again required to repeat a grade, her mother stated that since elementary school she had been taking summer school to complete her coursework. (R. 7, PageID.102.) The summer program provided her with a resource teacher like she had during the regular school year. (R. 7, PageID.103.) Tests at school were simplified and the number of questions reduced for Plaintiff, and she was given extended time to complete them. (R. 7, PageID.107.) But the school did not seem to completely comply with the IEP it had laid out for Plaintiff; she did not, for example, get the one-on-one time she needed or the 10 hours of resource-room time that the plan called for. (R. 7, PageID.111-112.)

Regarding Plaintiff's hearing, both ears had deficiencies, although one was worse than the other. (R. 7, PageID.104.) The device she had used since the eighth grade, an FM system, went in her ear and amplified the voice of a speaker (the teacher) who spoke into a microphone box. (*Id.*) After she kept forgetting to return the system, the school decided not to reissue it; consequently, she had not used it for the last year. (R. 7, PageID.105.)

Plaintiff did not need a hearing aid outside of school, but her mother said that "we do have to repeat ourselves in the house" and clarify their statements. (*Id.*) At her job, she worked with family who knew about her hearing loss and could accommodate her. (R. 7, PageID.105-106.) And when she babysat, she was never left alone with the children; someone else was always in the house. (R. 7, PageID.122.) Generally, people could understand what Plaintiff said, although they might struggle to decipher her meaning. (R. 7, PageID.116.)

Plaintiff got along well with her father and siblings, and she had a group of friends whose names she sometimes forgot. (R. 7, PageID.116-117.) But "[s]he only socializes at school" because when her friends had plans Plaintiff could not describe them well enough to enable her mother to feel comfortable letting her participate. (R. 7, PageID.117.)

Plaintiff dressed and readied herself for school in the morning, and did not have a problem being punctual. (R. 7, PageID.113-114.) She also helped around the house, but needed prodding to motivate her. (R. 7, PageID.115.) Instructions had to be doled out one step at a time or else Plaintiff would "miss something." (R. 7, PageID.119.) Although Plaintiff said she could follow recipes, her mother clarified that she would "improvise[] . . . if she doesn't know what a teaspoon is," for example. (R. 7, PageID.120.)

Plaintiff could be left home alone, but her mother was uncomfortable with it. (R. 7, PageID.125.) Plaintiff would, for example, let her brothers' friends into the house even if her brothers were not home. (*Id.*) But Plaintiff would not leave things on that should have been turned off. (*Id.*)

Her mind would wander, too, making it difficult for her to stay on task. (*Id.*) About 10 minutes of homework, for example, was the longest she could go without distraction. (*Id.*) Video games were a different matter, however, as she could become engulfed in them and maintain focus for longer periods. (R. 7, PageID.121.) Yet Plaintiff's teachers had not informed her mother that she struggled to pay attention in class—it was her comprehension that concerned them most. (*Id.*)

Her mother agreed that comprehension, not hearing loss, was Plaintiff's most significant impairment. (R. 7, PageID.127.) Plaintiff could slog through the classes but would ultimately fail to retain the information she learned. (*Id.*) Her mother also took issue with some of Plaintiff's testimony, stating that Plaintiff could not understand her homework or comprehend the teachers when she was able to hear them. (R. 7, PageID.128-129.)

### F. Analysis

Plaintiff's overarching argument is that that the ALJ erred by failing to conclude she had an extreme limitation in the domain of acquiring and using information.[3] That domain focuses on "how well you [*i.e.*, claimant] acquire or learn information, and how well you use the information you have learned." 20 C.F.R. § 416.926a(g). The thrust of the analysis is "how well a child actually uses his or her mental capacity," and thus serious limitations can exist even if the child's IQ is normal. 3 Soc. Sec. Disab. Claims Prac. & Proc. § 23:36 (2nd ed.); *see also Witherell ex rel. M.D.H. v. Comm'r of Soc. Sec.*, No. 13–

---

[3] Plaintiff parses out three numbered arguments, but all seem related to the "acquiring and using information" domain, which is the only domain she singles out in her analysis.

13350, 2014 WL 6791381, at *4 (E.D. Mich. Sept. 30, 2014) ("IQ tests are generally understood to measure a person's cognitive capability; there is nothing in the record that suggests how that measure addresses performance, which is the focus of the first domain.").

The regulations provide age-specific abilities that claimants should display. For adolescents (ages 12 to 18) in middle and high school, the child

> should continue to demonstrate what you [*i.e.*, the claimant] have learned in academic assignments (e.g., composition, classroom discussion, and laboratory experiments). You should also be able to use what you have learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation). You should be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas). You should also learn to apply these skills in practical ways that will help you enter the workplace after you finish school (e.g., carrying out instructions, preparing a job application, or being interviewed by a potential employer).

20 C.F.R. § 416.926a(g)(2)(v). Additionally, the regulations list examples of limitations in the domain:

> (i) You do not demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night.

> (ii) You cannot rhyme words or the sounds in words.

> (iii) You have difficulty recalling important things you learned in school yesterday.

> (iv) You have difficulty solving mathematics questions or computing arithmetic answers.

> (v) You talk only in short, simple sentences and have difficulty explaining what you mean.

20 C.F.R. § 416.926a(g)(3). These limitations "do not necessarily describe a 'marked' or 'extreme' limitation." *Id.* In addition, the Commissioner has elsewhere offered other

examples of limitations, including failing to use age-appropriate language, failing to develop the same "readiness skills" as peers, difficulty following simple instructions, difficulty understanding directions, and failing to write, read, and do arithmetic at the "appropriate grade level." SSR 09-3p, 2009 WL 396025, at *6 (Feb. 17, 2009).

In the present matter, the ALJ found only marked limitations in the domain. (R. 7, PageID.63.) The ALJ acknowledged the evidence indicating limitations, including Plaintiff's cognitive testing, her academic performance, her mother's testimony regarding difficulties learning and applying concepts, and Mr. Brooks's conclusion that Plaintiff had serious to very serious problems with "reading comprehension in both math and written materials." (*Id.*) Still, the ALJ thought that

> claimant's limitations in this domain are not extreme as supported by evidence that she achieves average or above average grades in classes that require these skills. Exhibit 12E [R. 7, PageID.283] shows that she is failing Algebra II and Environmental Science. However, claimant is earning an A in Junior ROTC and an A in English Language Arts, as well as a C in French I and a C in World History. Moreover, claimant receives resource room assistance and modified tests and other accommodations (preferential seating in the classroom and extra time to complete test as part of her IEP). However, she remains in [the] general education curriculum and the school expects her to graduate in June 2018. Reportedly, the school did not place claimant in the formal special education curriculum. This further confirms that, although markedly limited, claimant's limitations in this domain are not extreme.

(*Id.*) Elsewhere, the ALJ noted that her conclusion was supported by the consultants who reviewed the case in 2016. (R. 7, PageID.62, 141.)

According to Plaintiff, the ALJ failed to acknowledge that she "experiences extraordinary limitations in most of the" examples in 20 C.F.R. § 416.926a(g)(3) and SSR 09-3p, 2009 WL 396025, at *6. (R. 11, PageID.450.) The ALJ's decision mentions these

examples but fails to accurately engage them, according to Plaintiff. (R. 11, PageID.450 (citing R. 7, PageID.62-63).) "Specifically," Plaintiff explains, "she has difficulties recalling important things learned in school only the day before; she does not have the 'readiness' skills of a typical 11th grader; she has difficulty understanding written and oral instructions, and those instructions often must be repeated over and over before she understands; she has the mathematical understanding of a 1st grader." (*Id.*)

This litany contains conclusions without any supporting analysis or citations to the record; it essentially reproduces the examples with barely any individualization for the facts of this case, only referencing Plaintiff's grade, 11th, and the grade level of her mathematical skills, 1st. (*Id.*) Plaintiff provides more elaborate discussion of her IEPs. She observes that her grade-level testing in reading and math revealed she was many grades behind in both subjects. (R. 11, PageID.451.) And comparing the 2012 testing with the 2016 testing, Plaintiff continues, showed little improvement. In October 2012, Plaintiff says that she performed math at the 4th-grade level and her reading was at the 2nd- or 3rd-grade level. (*Id.* (citing R. 7, PageID.324-329).)[4] In 2016, her grade-levels were 5.4 in math and 3.8 in independent reading. (*Id.* (citing R. 7, PageID.398).)

Plaintiff blasts the ALJ for failing to consider this evidence demonstrating her lack of progress in reading from 2012 to 2016 and regression in her math skills over the same

[4] Her brief appears to cite the administrative record's internal pagination rather than the "PageID" pagination imposed across all case filings. Therefore, she cites record pages 288 through 293. Under the "PageID" numbering, pages 288 through 293 correlate to her counsel's brief to the Appeals Council. That brief discusses the same matters but does not cite to any materials to support its assertions.

period. (*Id.*) Under a separately numbered—but apparently related—argument, Plaintiff contends that this failure flouted SSR 09-1p, 2009 WL 396031, at *9 (Feb. 17, 2009), which requires ALJs to "consider the effects of the impairment(s) longitudinally (that is, over time) when [they] evaluate the severity of the child's limitations." (R. 11, PageID.453-454.) As an example, the Ruling—and Plaintiff, (R. 11, PageID.453)—cite 20 C.F.R. § 416.924a(b)(8), which tells claimants with "a chronic impairment(s) that is characterized by episodes of exacerbation (worsening) and remission (improvement)" that the Commissioner "will consider the frequency and severity of your episodes of exacerbation as factors that may be limiting your functioning." SSR 09-1p, 2009 WL 396031, at *9 n. 17 (quoting 20 C.F.R. § 416.924a(b)(8)). After again citing her flatlined or deteriorating test results, she concludes, "Clearly this is an individual who has extreme limitations in learning and being able to retain information she has learned and utilize it going forward. Again, if the IEPs are looked at longitudinally, as is required, there is an extreme limitation in her ability to learn — which leads to extreme limits in Acquiring and Using Information. (R. 7, PageID.454.)

The materials Plaintiff cites do not support her argument. Pages 324 to 329 under the PageID system do not contain the 2012 IEP materials she depends on. Instead, that page range is coterminous with Dr. Hayter's 2013 report. And I can find in neither that report nor the 2012 IEP testing the grade-level equivalencies (of 4th grade math and 2nd or 3rd grade reading) that Plaintiff claims  (R. 7, PageID.295-306, 324-329.) The 2012 IEP gives age equivalents, and perhaps Plaintiff has translated those into grade-level equivalents. *See, e.g.*, (R. 7, PageID.302.) For her part, Defendant also miscites the record, claiming that the

23

2012 IEP stretches from pages 295 to 323 in the PageID system. (R. 12, PageID.467.) But pages 307 through 323 bear dates from 2015, not 2012.

It appears that, instead of examining the dates on reports, both parties relied on the administrative record's tables of contents, which label the entire page range, 295 to 323 (PageID), as the 2012 IEP. (R. 7, PageID.30, 294.) Perhaps under some anachronism mandated by school bureaucracy, the 2015 materials fall under the umbrella of the 2012 IEP as an implicit update. But that would not change the fact that the second round of tests occurred in 2015. Moreover, the 2015 testing does not contain the grade-level equivalencies Plaintiff asserts; rather, it showed reading and math skills at the 3.2 to 5.5 grade levels, or the 5th and 6th grade levels (the report contains both characterizations of the scores). (R. 7, PageID.309-310.)

The true grade equivalencies, then, support the notion that Plaintiff's scores for reading did not improve and those for math declined, but the relevant period was only one year, from 2015 to 2016. This truncated timeframe cuts against the long-term picture Plaintiff paints of unbudgeable reading deficits and cratering math skills. And after this timeframe, other evidence could be selected to show Plaintiff's progress from 2015 to 2017. Her GPA in June 2015 was .333, with D's in Algebra I and music and F's in Spanish, history, and biology. (R. 7, PageID.309.) By 2017, her science grade remained an F but she had moved into Algebra II (although her grade had dipped to an F), her grades in foreign language (this time, French) and history had risen to C's, and she received two A's (in English and Junior ROTC). (R. 7, PageID.283.) Improvements such as this were enough to nudge up her overall GPA in 2016 and 2017. (R. 7, PageID.286-287.) It could be argued,

therefore, that her actual academic functioning, as opposed to her standardized test results, improved.

Further, Plaintiff's citation to 20 C.F.R. § 416.924a(b)(8), dealing with chronic impairments, is misplaced or at the very least undeveloped. She does not appear to suggest that her cognitive and functional abilities vacillate, degenerating at times and ameliorating at others. Instead, the gist of her argument is that her limitations in the acquiring and using information domain have remained constant or even worsened over time. *See, e.g.*, (R. 7, PageID.454.) In any event, Plaintiff does not offer any substantive argument under 20 C.F.R. § 416.924a(b)(8) and therefore forfeits that issue. *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citation omitted)).

Plaintiff's stronger argument is that the ALJ failed to adequately engage the contents of the IEPs. (R. 11, PageID.451-453.) She notes that the ALJ unduly emphasized her current grades without sufficiently acknowledging that "her classes are leveled at her performance level rather than her grade level." (R. 11, PageID.451.) "Her testing," she adds, "is far below the three standard deviations of the norm required for an extreme limitation pursuant to 20 C.F.R. §416.926a(e)(4)." (R. 11, PageID.452.) Also supporting her argument, she claims, is SSR 09-1p, 2009 WL 396031 (Feb. 17, 2009). (*Id.*) Under that Ruling, the Commissioner promises to consider any help a child receives "to make his functioning possible or to improve the functioning," because such help indicates "the child

will not be as independent as same-age peers" even if the child is able to function well with the support. SSR 09-1p, 2009 WL 396031, at *6. "The more help or support of any kind that a child receives beyond what would be expected for children the same age without impairments, the less independent the child is in functioning, and the more severe we will find the limitation to be." *Id.* at *7. Here, Plaintiff notes that her 10 hours a week in the resource room amounts to 28 percent of her school week. And even with the help she still struggles. (R. 11, PageID.453.) This need for "extensive help," she concludes, "was not adequately considered by the ALJ." (*Id.*)

Plaintiff's argument lands a few blows against the ALJ's decision. The ALJ's analysis failed to discuss the details of Plaintiff's IEPs and many of the other school records, which are critical sources of evidence in the "acquiring and using information" domain. *See Fagin ex rel. B.P. v. Comm'r of Soc. Sec.*, No. 1:10-cv-813, 2012 WL 213801, at *5 (S.D. Ohio Jan. 24, 2012) (citing SSR 09-3p and noting "[s]chool records provide important information in assessing limitations in the domain of acquiring and using information"). In this regard, the test scores contained in the records—specifically the standard deviations, as explained below—provide one of the few quantifiable markers of severity according to the regulations. 20 C.F.R. §§ 416.926a(e)(2)(iii), (iii). While the ALJ mentioned the scores and the other records, given the low scores on some tests (which I discuss below) a more thorough discussion would have been helpful.

Ultimately, however, none of these points convinces me that the ALJ erred. For one thing, the ALJ was not required to enumerate and dissect "every piece of evidence in the record for his decision to stand." *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665

(6th Cir. 2004). It was enough, then, that the ALJ did find that the IEPs and the other school records favored Plaintiff and also reviewed these materials to gauge the degree of Plaintiff's limitation, noting that the school records supported a "marked" limitation. (R. 7, PageID.63.) This conclusion was the same as that of Dr. Hanson, Dr. Khademian, and Ms. Lang, which the ALJ cited elsewhere (R. 7, PageID.62) and which Plaintiff does not address. *See Gower v. Comm'r of Soc. Sec.*, No. 13–14511, 2015 WL 163830, at *28 (E.D. Mich. Jan. 13, 2015) ("An ALJ does not have to . . . arrange the decision in a particular manner to show she analyzed the evidence."). And Dr. Hayter's report similarly determined that Plaintiff could "acquire and use information," (R. 7, PageID.329), although the ALJ did not cite it for this purpose, instead suggesting it supported Plaintiff. *Cf. Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) ("The court may review Dr. Haun's report, in its consideration of the record as a whole, to determine if the ALJ's decision was based upon substantial evidence, even if the ALJ failed to cite the report in its conclusion."). In a similar vein, Dr. Boneff, while not opining directly on "acquiring and using information," wrote that Plaintiff could "engag[e] in school and work type activities of a moderate degree of complexity." (R. 7, PageID.369.).

The ALJ also noted Mr. Brooks's report of Plaintiff's intra-domain functions. (R. 7, PageID.63, 413.) That report noted a very serious problem with reading and math comprehension. (R. 7, PageID.413.) It is true that these "are key components of the ability to acquire and use information." *Witherell*, 2014 WL 6791381, at *6. But Plaintiff does not attempt to explain why these scores require a finding of "extreme" limitation. In any case, the ALJ cited the report as among the most compelling evidence for Plaintiff, yet relied on

countervailing evidence to calibrate the degree of Plaintiff's limitation as "marked." In these circumstances, I cannot conclude that the ALJ misused the evidence. *Cf. id.* ("Reliance on this document [noting serious and very serious problems in key components] as substantial evidence that supports the ALJ's finding [of no disability] is misplaced.").

Further, Plaintiff's implication that the ALJ ignored her need for help is incorrect. (R. 11, PageID.453.) The decision explained that Plaintiff "receives resource room assistance and modified tests and other accommodations (preferential seating in the classroom and extra time to complete test[s] as part of her IEP)." (R. 7, PageID.63.) These accommodations, however, did not suggest an "extreme" limitation to the ALJ because Plaintiff "remains in the general education curriculum and the school expects her to graduate in June 2018." (R. 7, PageID.63.)

Plaintiff does not explain the flaws in this reasoning. It could be contended that the ALJ missed the point of SSR 09-1p by devaluing the help Plaintiff received due to the fact that, with the assistance, Plaintiff could function nearly normally, *i.e.*, complete high school in the general education program. The Ruling, however, states that children who function well with help still can have a limitation. SSR 09-1p, 2009 WL 396031, at *6. But this statement regards the existence of a limitation, not its degree. Rather, the severity of the limitation is measured by how much help the child receives; the more support, the more severe the limitation. *Id.* at *7. While Plaintiff notes that her resource room time took up a little over a quarter of her school week, she fails to explain how this or any other accommodation equates to an "extreme" rather than "marked" limitation. (R. 11,

PageID.453.) Moreover, Plaintiff's mother testified that Plaintiff was not actually receiving all ten hours of her weekly "resource room" time. (R. 7, PageID.112.)

Plaintiff fails to develop much of an argument regarding the significance of her raw test scores and how many standard deviations they fall below the mean. This information is relevant because the regulations peg "extreme" and "marked" limitations to certain test scores that are, respectively, two or three standard deviations below the mean score. 20 C.F.R. §§ 416.926a(e)(2)(iii), 416.926a(e)(3)(iii). Specifically, a limitation "will" be deemed "'marked . . . when [the claimant has] a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and [the claimant's] day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(2)(iii). Using the same language, the regulations prescribe that scores three standard deviations or more below the mean are "extreme." 20 C.F.R. § 416.926a(e)(3)(iii).

A "standard deviation" represents "how far a typical element deviates from the average," or put differently, it is "a sort of mean deviation from the mean." David H. Kay & David A. Freedman, "Reference Guide on Statistics, in Federal Judicial Center, *Reference Manual on Scientific Evidence*, 239, 298 (3d ed. 2011). Standard deviations encompass the same percentages of data in every normal distribution of data, which is the sort of distribution that is expected to occur for standardized test scores. *See Johnson v. Astrue*, 563 F. Supp. 2d 444, 458 (S.D. N.Y. 2008) (citing J.L. Devore & K.N. Berk, *Modern Mathematical Statistics with Applications*, 787 (2007)). In a normal distribution

29

of data, the mean, median, and mode are identical; a graphical representation would portray a symmetrical bell-shaped curve with the mean, median, and mode all in the exact middle. Univ. of Utah, *The Normal Distribution and Z Scores*, https://soc.utah.edu/sociology3112/ normal-distribution.php (last accessed May 8, 2019). For example:



*Normal distribution*, Wikipedia, https://en.wikipedia.org/wiki/Normal_distribution# CITEREFCasellaBerger2001 (last accessed May 8, 2019). A standard deviation is a portion of the curve stretching from the center to the right or left, *i.e.*, above and below the mean, respectively.

As noted, standard deviations represent the same percentage of the data in every normal distribution. The image above provides an estimate of these percentages; the more precise figures are as follows: 95.449 percent of all data falls within two standard deviations and 99.730 percent comes within three standard deviations. *Johnson*, 568 F. Supp. 2d at 459 n. 2 (citing D. Freedman *et al.*, *Statistics*, A–70 (1978)). Thus, for example, 4.551 percent of all data (100 minus 95.449) are above or below two standard deviations from the mean—because the curve is symmetrical, the same percentage will be above as

below. This means that 2.2755 percent of the data population (half of 4.551) will be two standard deviations or more below the mean. So a person falling within this category would be at or below the 2.2755 percentile. *See* Kay & Freedman, "Reference Guide," *supra*, at 292 (defining percentile). And .13 percent of the population will be three standard deviations or more below the mean; a person in this group would be at or below the .13 percentile. *See generally Johnson*, 568 F. Supp. 2d at 458 & 459 n. 2.

In the present case, Plaintiff does not say what testing was "far below . . . three standard deviations" or where she finds this data. (R. 11, PageID.452.) By my reading, the record mentions standard deviations once, in the 2015 IEP, which reported that her cognitive "development" was at or below two standard deviations from the mean. (R. 7, PageID.298, 300.) Being "below" two standard deviations makes it possible that Plaintiff was also below three standard deviations, but if that were the case the report likely would have said so. Moreover, "[t]he interpretation of the test is primarily the responsibility of the psychologist or other professional who administered the test," 20 C.F.R. § 416.926a(e)(4)(iii), and the IEP here concluded that this score indicated only a "mild" cognitive impairment, (R. 7, PageID.300.). Thus, to the extent this test score is relevant under 20 C.F.R. § 416.926a(e)—it probably is not, for reasons I discuss later—the lone mention of standard deviations appears to support the ALJ's conclusion regarding only "marked" limitations.

Other test scores provide Plaintiff's percentile ranking, ranging from below the 1st to above the 22nd, on tests measuring her adaptive functioning, math and reading skills, and speaking ability. (R. 7, PageID.297, 303, 309, 376-377.) Again, an open-ended score

31

of "below" any number means that she could fall within the .13 percentile and thus be three standard deviations below the mean—but none of the evidence explicitly indicates such a low score. Therefore, none of testing clearly comes at or below three standard deviations from the mean, and consequently the testing does not require a finding of "extreme" limitation under 20 C.F.R. § 416.926a(e)(3)(iii).

Even if Plaintiff could produce test scores to satisfy 20 C.F.R. § 416.926a(e)(3)(iii), she still has ignored other pertinent regulatory requirements. The qualifying scores come on "a comprehensive standardized test designed to measure ability or functioning in that domain." *Id.* Plaintiff does not discuss whether any of the tests fit this bill. *Cf. Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 723 (8th Cir. 2005) (rejecting similar argument when the plaintiff "does not indicate that any qualifying IQ score was on a test designed to measure capability in the domain of acquiring and using information"). Of the tests in the record, the only candidates potentially meeting the regulation are the cognitive "development" examination, on which she scored at or below two standard deviations, (R. 7, PageID.298), and two adaptive behavior tests, on which she ranked below the 1st and below the 2nd percentiles, (R. 7, PageID.303). Pure cognitive examinations do not necessarily reflect "performance, which is the focus of the first domain." *Witherell*, 2014 WL 6791381, at *4. In any event, the cognitive test administered to Plaintiff is left undescribed. *Cf. id.* The description of the adaptive testing is slightly more detailed. It covered a range of areas—such as skills in self-management at school, speaking, reading and writing, personal care and social interactions—but only some of these are related to acquiring and using information. (R. 7, PageID.303.) And these tests were completed by

Plaintiff's teacher and mother. Thus, nothing indicates that these tests are the sort of comprehensive surveys required by the regulations.

If Plaintiff could point to qualifying test scores on acceptable comprehensive examinations, she would still need demonstrate that her "day-to-day functioning in domain-related activities is consistent with that score," which is the final component of 20 C.F.R. §416.926a(e)(3)(iii). As the regulation explains to claimants, "we may find that you do not have a 'marked' or 'extreme' limitation, even if your test scores are at the level provided in paragraph (e)(2) or (e)(3) of this section, if other information in your case record shows that your functioning in day-to-day activities is not seriously or very seriously limited by your impairment(s)." 20 C.F.R. § 416.926a(e)(4)(ii).

Plaintiff does not tangle with this issue directly. *Cf. Moore*, 413 F.3d at 723 ("Furthermore, [the plaintiff] does not demonstrate that [her] day-to-day activities are consistent with a low IQ in this domain."). Elsewhere in her brief she does mention the accommodations Plaintiff received at school and her mother's testimony that she daily struggled to retain school lessons. (R. 11, PageID.452-453.) But the ALJ considered this evidence before finding other facts more probative. For example, the ALJ's decision relied on Plaintiff's grades, her successful work experience, her lack of disciplinary troubles, and her social life. (R. 7, PageID.62-63.) Of these, Plaintiff addresses only her grades—as discussed above—and her work experience, and on the latter topic she merely notes that her job did not constitute substantial gainful activity. (R. 11, PageID.449.) Consequently, Plaintiff has not endeavored to dispute the ALJ's characterization of her day-to-day functioning. That characterization, moreover, finds substantial support in the record. *See,*

*e.g.* (R. 7, PageID.85 (noting her friends at school), 99 (noting her lack of disciplinary problems at school), 116-117 (noting her good relations with family and her group of friends at school), 245 (noting her communications with friends on social media), 376 (noting appropriate interactions).)[5] And the ALJ could have also mentioned that Plaintiff used public transportation and shopped at stores, (R. 7, PageID.86-87, 248), two activities adolescents should be able to do according to the regulations. *See* 20 C.F.R. § 416.926a(g)(2)(v).

For these reasons, I find Plaintiff's arguments unconvincing. The key to her contentions was showing that her limitation was "extreme," not simply "marked." This she has failed to do. The ALJ's decision, of course, could have included a more detailed analysis, but it employed the proper legal standards and assembled substantial evidence to support its conclusion. In particular, the ALJ evaluated evidence favoring Plaintiff and explained why that evidence did not suggest an "extreme" limitation. The decision thus gives reasons for its conclusions. *Cf. Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[W]e cannot uphold an administrative decision . . . that because of contradictions or

---

[5] One potential social problem was that Plaintiff let her brothers' friends into the house when her brothers were gone. (R. 7, PageID.125.) Even if this was substantial evidence comparable to that cited above, the ALJ was not bound to credit it over those other materials. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("'The substantial-evidence standard . . . presupposes that there is a zone of choice within which decisionmakers can go either way, without interference by the courts.' . . . Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" (citations omitted)). In any case, interpersonal relations are more directly dealt with under a different domain, 20 C.F.R. § 416.926a(b)(1)(iii) (Interacting and relating with others), although activities such as social interaction could require abilities across multiple domains, *see* SSR 09-1p, 2009 WL 396031, at *3 ("The 'whole child' approach recognizes that many activities require the use of more than one of the abilities described in the first five domains.").

missing premises fails to build a logical bridge between the facts of the case and the outcome."). Those reasons are backed by substantial evidence—among other things, Plaintiff's grades, her placement in the general curriculum, and the consultants' opinion.

### G. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (R. 11), be **DENIED**, the Commissioner's Motion for Summary Judgment, (R. 12), be **GRANTED**, and this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

35

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 16, 2019      S/ PATRICIA T. MORRIS
              Patricia T. Morris
              United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 16, 2019      By s/Kristen Castaneda
              Case Manager